1

2

3

4

5

6

7

8

9

10

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

ROBIN BRUINS and BEVERLY
BRUINS,

                Plaintiffs,

    v.

DENNIS OSBORN, *et al.*,

                Defendants.

Case No. 2:15-cv-00324-APG-VCF

**ORDER GRANTING IN PART AND
DENYING IN PART THE
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

(Dkt. #22)

11

12

13

14

15

      Plaintiffs Robin and Beverly Bruins filed this lawsuit against various law enforcement officers who conducted a traffic stop, detained and searched the Bruins and their car, and then arrested Robin for possession of a stolen vehicle.[1]  Defendants Dennis Osborn, Juan Arias, Fernando Herrera, Amber Poehl, Daniel Slattery, and Brandi Estes move for summary judgment on the Bruins' claims against them.  I grant in part and deny in part the motion.

16

**I.  BACKGROUND**

17

18

19

20

21

22

23

24

      In March 2014, Robin and Beverly were driving through Nevada in their classic 1962 Chevrolet Impala. (Dkt. #32-8 at 3.)  The Bruins had a collector license plate on the car, as is allowed under the laws of the State of Washington where the car was registered. (*Id.*)  Nevada Highway Patrol ("NHP") Officer Fernando Herrera noticed the unusual license plates, which were of a style and design he had never seen before. (Dkt. #31-1 at 35.)  Herrera did not have a computer in his vehicle, so he called in to dispatch and provided the plate number on the Impala, KTZ681. (*Id.* at 34; Dkt. #31-1 Herrera video A at 17:18:32;[2] Dkt. #32-8 at 3.)  Defendant Brandi

25

26

27

28

---

[1] The Bruins also sued the Las Vegas Metropolitan Police Department and Naphcare, Inc.  Their claims against these defendants in counts five and six of the complaint arise from Robin's detention at the Clark County Detention Center following his arrest.  Those claims are not addressed in this Order.

[2] The defendants attached to their motion two compact discs containing video clips from the patrol cars of Herrera, Slattery, and Poehl. (Dkt. #31-1.)  The first disc contains two videos from Herrera's

1   Estes was the dispatcher who responded. (Dkt. #31-1 at 35, 43.) Estes ran the plate through the

2   Criminal Justice Information System ("CJIS"), and she told Herrera the plate returned with no

3   record found. (*Id.* at 35, 43; Herrera video A at 17:19:08.) Herrera then pulled the Bruins over.

4   (Dkt. #31-1 at 35; Herrera video A at 17:19:36.)

5         Herrera approached the Impala and told the Bruins he could not verify the plates on the

6   car. (Herrera video A at 17:20:33.) He requested a driver's license, registration, and proof of

7   insurance. (*Id.* at 17:30:35; Dkt. #31-1 at 35.) Robin, who was driving, provided the requested

8   documents. (Herrera video A at 17:21:24; Dkt. #31-1 at 35.) While reviewing the documents,

9   Herrera commented to the Bruins that the registration was "a little weird" because it listed the

10   physical license plate number on the car as the "Equipment Number" on the registration. (Herrera

11   video A at 17:21:47.) The audio from the video clip is garbled from wind and passing traffic, but

12   it appears that Robin offered some explanation for the discrepancy. (*Id.* at 17:22:00.) In response,

13   Herrera indicated he would check the information on the registration. (*Id.* at 17:22:07.) Herrera

14   then returned to his vehicle. (*Id.*)

15         The State of Washington registration form had a box labeled "License Plate" that

16   displayed the number +793257 rather than the physical license plate that was on the Impala. (Dkt.

17   #31-1 at 35.) The registration had another box labeled "Equipment Number" that matched the

18   license plate on the Impala, KTZ681. (*Id.*) Herrera had never before seen a registration that listed

19   the license plate number under "Equipment Number." (*Id.* at 36.) He also had not seen a

20

21   vehicle. I refer to the video beginning at 17:17:36 as "Herrera video A." I refer to the other as "Herrera

22   video B." Times cited from the videos are approximate.

23       Although the Bruins object to the videos as unauthenticated, the defendants have authenticated
them. (*See* chain of custody documents on compact disc containing videos & Dkt. #35-1 at 2-3.)

24   Additionally, to authenticate, the defendants need only present evidence sufficient to show that the videos
are what the defendants claim they are. Fed. R. Evid. 901(a). The videos may be authenticated by their

25   "appearance, contents, substance, . . . or other distinctive characteristics of the item, taken together with all
the circumstances." Fed. R. Evid. 901(b)(4). The videos show the Bruins' traffic stop that generally

26   comports with both sides' version of the events. The Bruins do not dispute the videos are authentic.
Moreover, the Bruins rely on the videos themselves in opposing summary judgment. Indeed, some of the

27   Bruins' arguments, such as their arguments based on the officers' statements on the scene regarding
whether probable cause existed, are supported only by the video evidence. I therefore will consider the

28   videos on summary judgment.

registration listing a license plate number other than the one that is on the physical license plate. (*Id.*)

Herrera called in to dispatch with the plate number listed on the registration as 793257, but without the + symbol in front of it. (*Id.* at 6, 34, 36, 44; Herrera video A at 17:22:42.) According to Herrera, he did not include the + symbol because NHP's system does not allow use of any special characters or symbols. (Dkt. #31-1 at 34.) Herrera avers that he knew if he gave the number with the + symbol, the dispatcher would ignore the symbol or, if the dispatcher ran it with the symbol, the search would return an error message.[3] (*Id.* at 35.) Estes responded that the search in CJIS returned for an expired 1995 vehicle out of Washington. (*Id.* at 36, 44; Herrera video A at 17:23:03.)

Herrera then requested information on the VIN number, which he correctly reported to dispatch as 21847L214899. (Dkt. #31-1 at 6; Herrera video A at 17:23:17.) Estes avers that she correctly entered the VIN number and the search resulted in a return from the National Crime Information Center for a stolen 1963 Chevrolet Impala, but for the VIN number 31847L214899. (Dkt. #31-1 at 12, 15, 44.) Thus, the return for a stolen vehicle did not match the Bruins' car because the first number of the VIN was different. The search return stated that it was based on a "partial VIN search" and directed the requester to "verify all data before taking further action based on this response." (*Id.* at 12.) Rather than verbally report this information to Herrera, Estes sent a "felony warble tone" and called a channel code red,[4] which Herrera understood to mean that the vehicle was stolen. (*Id.* at 36, 45; Herrera video A at 17:24:45.)

Herrera waited for backup. (Dkt. #31-1 at 36.) Defendant officers Slattery and Poehl arrived on the scene, and the three officers conducted a "Felony/High Risk Vehicle Stop" procedure. (*Id.* at 36, 48, 52.) According to Herrera, he was trained to use this procedure "when a stop poses a significant risk to officers when dealing with multiple occupants in a vehicle." (*Id.* at

---

[3] Estes likewise avers that she could not have run the plate with the + symbol and that if she did, she would get an error message. (Dkt. #31-1 at 43.)

[4] A channel code red "informs other troopers to stay off the radio channel in use." (Dkt. #31-1 at 45.)

36.)  Herrera avers that the risk to officers is "greater when the officer has reasonable belief that the person or persons inside the vehicle are known or suspected felons, armed, or potentially dangerous to the officer and/or the public." (*Id.* at 36-37.)

Herrera ordered Robin to get out of the vehicle with his hands in the air while all three troopers aimed their guns at Robin. (Dkt. #32-8 at 3; Herrera video A at 17:36:39; Poehl video at 17:36:29.)  Robin did as instructed. (Herrera video A at 17:36:43.)  Herrera told Robin to walk backwards towards the officers with his hands up, which Robin did. (Dkt. #32-8 at 3; Herrera video A at 17:36:54.)  Herrera ordered Robin to lift his shirt, and in response, Robin took his shirt off. (Dkt. #32-8 at 3; Herrera video A at 17:37:06.)  Herrera instructed Robin to turn in a circle with his hands up and then to drop to his knees, and Robin complied. (Dkt. #32-8 at 3-4; Herrera video A at 17:37:22.)  Slattery then placed Robin in handcuffs and patted him down. (Dkt. #31-1 at 48; Dkt. #32-8 at 4; Herrera video A at 17:37:51; Poehl video at 17:38:23.)

Beverly was then ordered out of the car, also at gunpoint. (Dkt. #32-9 at 3; Herrera video A at 17:38:27.)  Herrera instructed her to put her hands up and walk backwards toward the officers, but Beverly had a broken leg, so she reached into the car for her crutches. (Dkt. #32-9 at 3; Herrera video A at 17:38:47.)  When she did so, Herrera commanded her to place her hands in the air. (Herrera video A at 17:38:48.)  When Herrera saw the crutch, he said, "Ok," and directed Beverly to walk backwards toward the officers. (*Id.* at 17:38:55.)  Beverly did so with one hand in the air and the other on her crutch. (*Id.* at 17:38:58.)  Poehl handcuffed Beverly and placed her in the rear of Poehl's car with the door open. (Dkt. #31-1 at 52; Dkt. #32-9 at 3-4; Herrera video A at 17:39:09; Poehl video at 17:39:30.)

After the Bruins were out of the Impala, Herrera and Slattery looked in the back seat and opened the trunk to ensure there was no one else in the car. (Dkt. #31-1 at 38; Herrera video A at 17:39:30.)  Upon verifying no one else was in the car, the officers left the trunk open, but did not search the contents. (Herrera video A at 17:40:20.)  Herrera asked Slattery to check whether the VIN on the registration matched the VIN on the Impala's doorframe, and Slattery confirmed the numbers were the same. (Dkt. #31-1 at 38, 48; Herrera video A at 17:41:07.)

Herrera advised Robin of his *Miranda* rights and questioned him about the vehicle. (Dkt. #31-1 at 38; Dkt. #32-8 at 4; Herrera video A at 17:41:46.)  Herrera told Robin the VIN number came back as belonging to a stolen car but Robin denied knowing anything about it being stolen. (Herrera video A at 17:42:28.)  Robin told Herrera that he had purchased the Impala in October 2013 in California after responding to an ad on Craigslist. (Dkt. #31-1 at 38; Herrera video A at 17:42:31, 17:43:53.)  Herrera avers that based on his experience in law enforcement, many stolen items are sold on Craigslist. (Dkt. #31-1 at 38.)  Robin gave the name of the person from whom he bought the car and stated that the seller had purchased it from a friend in Arizona. (*Id.* at 38; Herrera video A at 17:44:00.)  Robin also told Herrera that he paid $22,000 for the vehicle but that he reported a purchase price of $9,000 to the Washington Department of Motor Vehicles ("DMV") to save money on taxes and because he felt he had overpaid for the car. (Dkt. #31-1 at 38; Herrera video A at 17:43:09.)  Robin stated that the Washington DMV had not inspected the Impala because that was not required. (Dkt. #31-1 at 38.)

Herrera advised Robin that they would tow the Impala as a recovered stolen car. (Herrera video A at 17:44:33.)  Herrera also told Robin that he was in possession of a stolen vehicle and that he was under arrest. (*Id.* at 17:44:50.)  Robin asked whether the State of Washington should have checked whether the car was stolen when he registered it and Herrera responded that the DMV does not always check. (*Id.* at 17:45:06.)  Herrera asked Robin whether he had ever been arrested or gotten a ticket, and Robin said he had not been arrested but had gotten a speeding ticket. (*Id.* at 17:45:12.)

After speaking with Robin, Herrera called a sergeant, defendant Arias, to discuss the situation. (*Id.* at 17:46:57; Dkt. #31-1 at 39, 56.)  Herrera told Arias that the Bruins were an elderly couple, and although he had not inquired about the driver yet, the passenger had no record. (Herrera video A at 17:47:20.)  Herrera then told Arias about how Robin purchased the vehicle, that Robin's name was on the title and registration, but that the VIN came back as belonging to a stolen vehicle. (*Id.* at 17:47:25.)  Herrera stated to Arias that although Robin was in possession of a stolen vehicle, often when people purchase stolen vehicles they do not know

1    the cars are stolen. (*Id.* at 17:47:57.)  The video does not capture what Arias said in response, but

2    Herrera stated that he "tends to believe" Robin and that Robin "seems to be legit." (*Id.* at

3    17:48:20-35.)  Herrera also expressed the opinion that the registration appeared legitimate. (*Id.* at

4    17:48:43.)  But he explained that he ran the plate and that it came back with no records even

5    though the registration had the plate number on it. (*Id.* at 17:48:55, 17:50:10.)  Herrera then told

6    Arias the registration was "weird" because it had a different number for the license plate and had

7    the license plate number under "Equipment Number." (*Id.* at 17:50:32.)

8    　　　While still on the phone with Arias, Herrera asked Robin how he registered the vehicle in

9    Washington. (*Id.* at 17:54:28.)  Robin responded that he took the title the seller gave him and

10   registered it at the DMV in Washington. (*Id.* at 17:17:33.)  Herrera then asked where Robin got

11   the license plate. (*Id.* at 17:17:35.)  Robin responded that he purchased the plate from a private

12   party in Washington as a collector plate for his antique car and that this practice is common in

13   Washington. (*Id.* at 17:54:50.)  Herrera relayed this information to Arias. (*Id.* at 17:55:15.)

14   Herrera then asked Robin whether he had the car inspected in Washington and Robin responded

15   that it was not required. (*Id.* at 17:55:35.)

16   　　　While Herrera talked to Arias, Slattery searched the Impala. (Dkt. #31-1 at 39; Herrera

17   video A at 17:50:00.)  According to Herrera and Slattery, Slattery was conducting an inventory

18   search in anticipation of the Impala being towed. (Dkt. #31-1 at 39, 48.)

19   　　　After talking with Arias, Herrera decided to arrest Robin for possession of a stolen

20   vehicle. (*Id.* at 39, 56; Herrera video A at 17:56:05.)  Herrera advised Robin of his decision and

21   explained that the vehicle was reported stolen and had "fictitious" plates and registration.

22   (Herrera video A at 18:00:20.)  Robin responded that it was common in Washington to buy a

23   license plate matching the year of the antique vehicle. (Herrera video B at 18:01:00.)  Herrera

24   indicated that there was "just too much stuff" that "doesn't add up," and because Robin was from

25   out of state, he was a flight risk. (*Id.* 18:01:24.)  After several minutes at the scene, Herrera can be

26   heard off camera stating that he was "just going to do a warrant but Sarge said . . . ." (*Id.* at

27

28

18:18:20.)  Herrera then took Robin to the Clark County Detention Center. (Dkt. #31-1 at 39, 56; Herrera video B at 18:25:15.)

Throughout much of this encounter, Beverly remained handcuffed sitting in Poehl's vehicle. (Dkt. #31-1 at 39, 52.)  Poehl ran a check on Beverly which uncovered no criminal record. (Poehl video at 17:45:20, 17:58:00; Herrera video A at 17:47:20.)  Approximately twelve minutes after Beverly was taken into custody, Poehl approached Slattery and stated, "[t]hese poor people." (Poehl video at 17:51:25.)  Slattery responded that he thought Robin bought the Impala legitimately and Poehl agreed that the Bruins had "no idea." (*Id.* at 17:51:28.)  Poehl decided to transfer Beverly to Slattery's handcuffs and car so Poehl could leave the scene. (*Id.* at 17:51:45.)  Poehl and Slattery discussed that Beverly had a broken leg and that Slattery likely could catch her even if she tried to run. (*Id.* at 17:52:00.)  Poehl exchanged her handcuffs on Beverly for Slattery's and moved Beverly to Slattery's car. (*Id.* at 17:53:11.)  Poehl then left the scene. (*Id.* at 17:58:17.)

After approximately 25 minutes from when Beverly was first placed in handcuffs, Slattery removed them. (*Id.* at 17:39:30; Slattery video 18:05:47; Dkt. #31-1 at 39, 52.)  The officers allowed Beverly to remove the Bruins' personal property from the Impala, and they called a taxi to transport her and the couple's belongings from the roadside. (Dkt. #32-9 at 4; Herrera video B at 18:02:30.)  The Impala was towed. (Herrera video B at 18:22:49.)

The charges against Robin were dropped the next day after Beverly talked with Sergeant Davidson at NHP. (Dkt. #32-6 at 2; Dkt. #32-9 at 4.)[5]  According to Beverly, Davidson told her that the dispatcher had incorrectly entered the VIN number, resulting in the erroneous stolen vehicle report. (Dkt. #32-9 at 4.)  The NHP returned the plates and registration to Beverly and sent a fax to the Clark County Detention Center requesting Robin's release, stating, "[n]o probable cause to arrest.  Improper verification on stolen vehicle." (Dkt. #32-7; Dkt. #32-9 at 4.)

---

[5] The defendants object to exhibits attached to the Bruins' response, which were purportedly obtained from a public records request, as unauthenticated.  Because these exhibits do not affect the outcome of my decision, and because the defendants dispute only authentication and not authenticity, I will consider the exhibits for background and context for the Bruins' arguments.

1  Robin was released from custody more than twenty-four hours after his arrest. (Dkt. #32-8 at 4;

2  Dkt. #32-9 at 5.)

3  The Bruins brought this lawsuit against Herrera, Slattery, Poehl, Arias, and Estes based on

4  their participation in the incident. The Bruins also sued defendant Dennis Osborn, Chief of NHP,

5  for allegedly implementing policies that led to the incident. The Bruins assert against defendants

6  Osborn, Arias, Herrera, Poehl, and Slattery claims for unreasonable seizure under the Fourth

7  Amendment (counts one and two), false imprisonment under state law (counts seven and eight),

8  unreasonable search and seizure regarding the car (count three), and (2) a due process violation

9  for depriving them of their car without notice and an opportunity to be heard (count four). The

10  Bruins assert against Herrera, Slattery, Poehl, Arias, Osborn, and Estes claims for negligence and

11  negligent infliction of emotional distress (counts nine, ten, and eleven). The defendants move for

12  summary judgment on each of the claims against them.

13  **II. ANALYSIS**

14  Summary judgment is appropriate if the pleadings, discovery responses, and affidavits

15  demonstrate "there is no genuine dispute as to any material fact and the movant is entitled to

16  judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is material if it "might affect the

17  outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

18  (1986). An issue is genuine if "the evidence is such that a reasonable jury could return a verdict

19  for the nonmoving party." *Id.*

20  The party seeking summary judgment bears the initial burden of informing the court of the

21  basis for its motion and identifying those portions of the record that demonstrate the absence of a

22  genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden

23  then shifts to the non-moving party to set forth specific facts demonstrating there is a genuine

24  issue of material fact for trial. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir.

25  2000). I view the evidence and reasonable inferences in the light most favorable to the non-

26  moving party. *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 920 (9th Cir. 2008).

27  ////

28

1

### A. Section 1983 Claims

2        To establish liability under § 1983, a plaintiff must show the violation of a right secured

3 by the Constitution and laws of the United States, and must show that the deprivation was

4 committed by a person acting under color of state law. *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th

5 Cir. 2003).  The defendants do not contest that they acted under color of law.  Thus, the dispute

6 centers on whether the defendants violated the Bruins' constitutional rights.

7        Additionally, the defendants argue they are entitled to qualified immunity.  To allay the

8 "risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials

9 in the discharge of their duties," government officials performing discretionary functions may be

10 entitled to qualified immunity for claims made under § 1983. *Anderson v. Creighton*, 483 U.S.

11 635, 638 (1987).  Qualified immunity protects "all but the plainly incompetent or those who

12 knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  In ruling on a qualified

13 immunity defense, I consider whether the evidence viewed in the light most favorable to the

14 nonmoving party shows the defendant's conduct violated a constitutional right. *Sorrels v. McKee*,

15 290 F.3d 965, 969 (9th Cir. 2002).  If the plaintiff has shown the defendant violated a

16 constitutional right, I then must determine whether that right was clearly established. *Id.*

17        A right is clearly established if "it would be clear to a reasonable officer that his conduct

18 was unlawful in the situation he confronted." *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th

19 Cir. 2003) (emphasis omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).  I make this

20 second inquiry "in light of the specific context of the case, not as a broad general proposition."

21 *Saucier*, 533 U.S. at 201.  An officer will be entitled to qualified immunity even if he was

22 mistaken in his belief that his conduct was lawful, so long as that belief was reasonable. *Wilkins*,

23 350 F.3d at 955.

24        <u>1. Unreasonable Search and Seizure (counts one, two, and three)</u>

25        In counts one and two, Robin and Beverly assert § 1983 claims against Herrera, Poehl,

26 Slattery, and Arias for violating their Fourth Amendment right to be free from unreasonable

27 seizure.  In count three, the Bruins assert Herrera, Slattery, Poehl, and Arias searched the Impala

28

1    and the Bruins' personal property in the Impala without probable cause in violation of their

2    Fourth Amendment right to be free from unreasonable searches.  In each of these counts, the

3    Bruins allege that Osborn and Arias caused these violations by enacting or perpetuating a policy

4    or practice that led to the constitutional violations.

5         The defendants contend they are entitled to summary judgment on these claims because

6    they had probable cause to stop the vehicle and detain its occupants pending investigation.  They

7    also argue they had probable cause to arrest Robin.  Alternatively, they contend they are entitled

8    to qualified immunity because even if probable cause was lacking, they made a reasonable

9    mistake about whether probable cause existed.  They contend Beverly's 30-minute detention in

10   handcuffs was reasonable.  Finally, they assert that because Osborn did not personally participate

11   in the traffic stop, he should be dismissed.

12        The Bruins respond that issues of fact remain regarding whether the officers had probable

13   cause.  The Bruins assert that Herrera based probable cause on a search of a license plate number

14   he knew would not return a match because he did not include the + symbol.  The Bruins also

15   argue Herrera erroneously relied on an unreliable warble tone from dispatch without confirming

16   the stolen vehicle report.  Additionally, the Bruins contend that possession of a stolen vehicle

17   requires that the person know or have reason to believe the car is stolen.  They contend the

18   officers lacked probable cause on the knowledge element because: (1) the officers on the scene

19   expressed their belief that the Bruins did not know the car was stolen, (2) the Bruins denied they

20   knew it was stolen and provided paperwork showing they owned it, and (3) following Robin's

21   arrest, the fax to Clark County Detention Center stated there was "[n]o probable cause to arrest."

22   They also contend that the defendants removed them from the car at gunpoint, handcuffed them,

23   and detained Beverly in handcuffs for 30 minutes even though she was cooperative, so the

24   manner in which they were detained was unreasonable.  Finally, the Bruins argue the defendants

25   are not entitled to qualified immunity for these same reasons.

26        In civil cases, the existence of probable cause generally is a fact question for the jury.

27   *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994).  However, if there is no genuine

28

1   issue of fact even when viewing the evidence in the light most favorable to the nonmoving party,

2   then "summary judgment is appropriate if no reasonable jury could find an absence of probable

3   cause under the facts." *Id.*

4       "Probable cause exists when, under the totality of the circumstances known to the

5   arresting officers (or within the knowledge of the other officers at the scene), a prudent person

6   would believe the suspect had committed a crime." *Blankenhorn v. City of Orange*, 485 F.3d 463,

7   471 (9th Cir. 2007). "[P]robable cause means 'fair probability,' not certainty or even a

8   preponderance of the evidence." *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006)

9   (en banc). It "requires only a probability or substantial chance of criminal activity, not an actual

10  showing of such activity." *United States v. Tan Duc Nguyen*, 673 F.3d 1259, 1264 (9th Cir. 2012)

11  (quoting *New York v. P.J. Video, Inc.*, 475 U.S. 868, 877-78 (1986)).

12      The inquiry is based on the "facts known to the arresting officer at the time of the arrest."

13  *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). This may include objectively reasonable

14  information provided by other law enforcement personnel. *Green v. City & Cnty. of S.F.*, 751

15  F.3d 1039, 1045 (9th Cir. 2014); *see also United States v. Mounts*, 248 F.3d 712, 715 (7th Cir.

16  2001) (stating that "police officers are entitled to rely on the reasonable information relayed to

17  them from a police dispatcher") (citing *United States v. Hensley*, 469 U.S. 221, 231 (1985)). A

18  "stolen vehicle report alone furnishes sufficient basis to arrest the driver" even if that report later

19  turns out to be incorrect. *Rohde v. City of Roseburg*, 137 F.3d 1142, 1144 (9th Cir. 1998) ("When

20  a person operates an automobile, he is effectively in possession of the vehicle and can reasonably

21  be presumed aware of its ownership."). Thus, "[i]f an officer has reliable information, such as a

22  police report, indicating that the vehicle has been stolen, he thus has probable cause to believe

23  that the driver has committed the crime of either stealing the car or knowingly operating a stolen

24  vehicle." *Id.*

25      "[A]n officer need not have probable cause for every element of the offense."

26  *Blankenhorn*, 485 F.3d at 472 (quotation omitted). But if the offense at issue requires specific

27

28

1    intent as an element, the officer "must have probable cause for that element in order to reasonably

2    believe that a crime has occurred." *Id.* (quoting *Gasho*, 39 F.3d at 1428).

3            Finally, the inquiry is objective. *Devenpeck*, 543 U.S. at 153 ("Our cases make clear that

4    an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the

5    existence of probable cause."). Thus, the officer's subjective belief about whether or not probable

6    cause existed is irrelevant. *Ewing v. City of Stockton*, 588 F.3d 1218, 1231 n.20 (9th Cir. 2009)

7    (stating that the officer "expressed doubt as to the existence of probable cause, but his subjective

8    beliefs are irrelevant; the standard is objective") (citing *United States v. Lopez*, 482 F.3d 1067,

9    1072 (9th Cir. 2007)); *United States v. Moses*, 796 F.2d 281, 284-85 (9th Cir. 1986) (stating the

10   officer's testimony that she did not believe probable cause existed did not alter the court's

11   conclusion that it did).

12           Here, even viewing the facts in the light most favorable to the Bruins, no reasonable jury

13   could find that probable cause was lacking. Herrera ran the license plate on the car and received a

14   return of no records found. The registration Robin provided listed a different license plate

15   number than the one on the vehicle, and this number returned as belonging to an expired 1995

16   vehicle. Herrera then checked on the VIN number which, based on the information known to him

17   at the time, returned as a stolen vehicle. Herrera was entitled to rely on the information being

18   provided to him by dispatch. Because he could not see the returns himself, he had no reason to

19   suspect that the information Estes provided him was inaccurate or otherwise subject to

20   qualification.

21           The Bruins contend that the officers on the scene did not think that Robin knew the car

22   was stolen and thus probable cause was lacking because possession of a stolen vehicle requires

23   the person to know or have reason to believe the car is stolen. *See* Nev. Rev. Stat.

24   § 205.273(1)(b). Although the officers expressed doubts about whether Robin knew the car was

25   stolen, the officers' subjective beliefs are irrelevant. The probable cause inquiry is an objective

26   one and the officers had probable cause to believe the car was stolen and that Robin knew or

27   should have known that it was. The suspicious circumstances surrounding the license plate which

28

produced no records, the registration which returned to a different vehicle, and a VIN number reported stolen, combined with Robin's statements, objectively support probable cause, including the knowledge element. Robin's statements about how he purchased the car from Craigslist from someone who claimed it was purchased from a friend in Arizona is consistent with the car being stolen. Robin also stated that he purchased the plates from a private individual rather than obtaining the plates from the DMV. The circumstances of how Robin purchased the car, separately purchased the plates, registered it without inspection, and told the Washington DMV he paid less for the car than he claims he did support a fair probability that Robin knew or should have known the car was stolen.

The Bruins contend that their documentation and answers to questioning should have dispelled any suspicion. However, the documentation they provided contained discrepancies. The license plate number on the registration did not match the license plate on the Impala, and neither the physical plate nor the listed plate number returned a valid registration for the vehicle.

Finally, the Bruins contend that the fax to the Clark County Detention Center stating that there was "[n]o probable cause to arrest" raises an issue of fact. However, the fax was sent the next day and was based on a subsequent investigation into the mismatched VIN number on the stolen vehicle report. That information was not known to the officers on the scene at the time they made the arrest. It therefore does not raise an issue of fact as to whether the officers had probable cause at the time of arrest.

For these same reasons, even if probable cause was lacking, the officers made a reasonable mistake in believing that probable cause existed. They therefore are entitled to qualified immunity. In sum, I grant the defendants' motion for summary judgment on counts one, two, and three to the extent those claims are based on a lack of probable cause.

However, the defendants have not met their initial burden under Rule 56 of showing they are entitled to judgment as a matter of law on the reasonableness of the manner in which the Bruins were detained. The fact that the officers received a report that the car was stolen does not necessarily justify removing the Bruins from the car at gunpoint and detaining Beverly in

1   handcuffs for 30 minutes. *See, e.g.*, *Green*, 751 F.3d at 1049-51.  The defendants make no

2   argument and cite no law for the proposition that the existence of probable cause establishes that

3   the manner in which the officers detained the Bruins was reasonable or that the defendants are

4   entitled to qualified immunity in connection with the manner of detention.  I therefore deny

5   summary judgment on counts one and two to the extent they are based on the reasonableness of

6   the manner by which the Bruins were detained.

7       Finally, I deny the motion on the remaining portions of the Bruins' § 1983 claims as to

8   defendants Osborn and Arias.  The complaint alleges that these two defendants are liable based

9   on creating or perpetuating policies that led to the violations.  These defendants did not move for

10  summary judgment on the basis that they did not implement or perpetuate any policies.  They

11  therefore did not meet their initial burden of establishing they are entitled to judgment as a matter

12  of law under Rule 56.[6]

13                2.  Deprivation of Property Without Due Process (count four)

14      In count four, the Bruins allege that Herrera, Poehl, Slattery, and Arias deprived them of

15  the Impala without notice and an opportunity to be heard in violation of their Fifth and Fourteenth

16  Amendment rights.  They also allege Osborn and Arias created or perpetuated a policy or custom

17  that encouraged NHP troopers to seize and impound property without notice and an opportunity

18  to be heard.

19      The defendants argue they had probable cause to believe the Impala was stolen, so they

20  were permitted to arrest Robin and seize the Impala, and the Bruins received all the process they

21  were due.  The Bruins argue issues of fact remain about probable cause.

22      Probable cause existed and the plaintiffs do not dispute that the officers could conduct an

23  inventory search prior to towing.  I therefore grant the defendants' summary judgment motion on

24  count four.

25  / / / /

26  _____

27      [6] I decline to consider arguments and evidence about Osborn's status as a policymaker which were
    raised for the first time in the reply brief. *See 7912 Limbwood Court Trust v. Wells Fargo Bank, N.A.*, 979
28  F. Supp. 2d 1142, 1152 (D. Nev. 2013).

1

**B.  State Law Claims**

2      The Bruins assert state law claims for false imprisonment, negligence, and negligent

3  infliction of emotional distress.  The defendants argue these claims fail because the officers had

4  probable cause and because detention while the officers investigated was reasonable.

5  Alternatively, they contend they are entitled to discretionary immunity.  The Bruins respond that

6  issues of fact remain as to whether the officers had probable cause.  They also argue the

7  defendants have not shown their conduct was grounded in social, economic, or political policy

8  such that the defendants would be entitled to discretionary immunity.

9                    1.  Discretionary Immunity

10      Because Officer Herrera had reasonable suspicion to pull over the Bruins' car, which

11  ripened into probable cause that the car was stolen, the officers were legally justified in making

12  the initial traffic stop and subsequently arresting Robin.  The defendants therefore are entitled to

13  summary judgment on the Bruins' false imprisonment claims to the extent those claims are based

14  on a lack of probable cause. *See Marschall v. City of Carson*, 464 P.2d 494, 497 (Nev. 1970)

15  (stating that where false imprisonment is based on a false arrest, there must be a lack of legal

16  cause or justification); Nev. Rev. Stat. § 171.123(1) ("Any peace officer may detain any person

17  whom the officer encounters under circumstances which reasonably indicate that the person has

18  committed, is committing or is about to commit a crime.").  For these same reasons, the

19  defendants' decisions to stop and then arrest Robin also do not breach any duty, which is required

20  to support the negligence claims.

21      Moreover, the officers are entitled to discretionary immunity for the decision to arrest

22  Robin, and Estes is entitled to discretionary immunity for her decision about what to convey to

23  the officers on the scene, because these decisions are discretionary and based on policy

24  considerations of enforcing the criminal laws. *See Gonzalez v. Las Vegas Metro. Police Dep't*,

25  No. 61120, 2013 WL 7158415, at *2-3 (Nev. Nov. 21, 2013) (holding that an officer's decision to

26  arrest based on a matched description in a facially valid warrant was entitled to discretionary

27  immunity); *Martinez v. Maruszczak*, 168 P.3d 720, 729 (Nev. 2007) (en banc) (holding that

28

discretionary immunity applies if the officer's decision "(1) involve[d] an element of individual judgment or choice and (2) [was] based on considerations of social, economic, or political policy"). As in *Gonzalez*, the defendants "could be faced with the difficult choice between releasing a potential criminal . . . or running the risk of potential civil liability in . . . close cases. Officers must be able to make [these] decision[s] confidently." *Id.* Imposing liability under these circumstances may jeopardize the quality of law enforcement operations. *See Martinez*, 168 P.3d at 729.

However, as with the § 1983 claims, the defendants have not met their initial burden of showing they are entitled to summary judgment on the false imprisonment and negligence claims based on the manner in which Herrera, Slattery, and Poehl detained the Bruins.[7] The defendants state in conclusory fashion that the 30-minute detention of Beverly was reasonable. But they do not analyze the means by which they removed the Bruins from the Impala or the fact that Beverly was held in handcuffs during that time. As for discretionary immunity, acts taken in violation of the Constitution cannot be considered discretionary. *Mirmehdi v. United States*, 689 F.3d 975, 984 (9th Cir. 2011); *Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000). Because the defendants have not shown that the nature and amount of force used was reasonable under the Constitution as a matter of law, they have not shown they are entitled to discretionary immunity. Moreover, "[d]ecisions regarding the amount of force to use are not the kind of policy decisions the discretionary-function exception was designed to shield." *Vasquez-Brenes v. Las Vegas Metro. Police Dep't*, 51 F. Supp. 3d 999, 1013 (D. Nev. 2014). Thus, the defendants have not shown that they are entitled to discretionary immunity.

Defendants Arias and Osborn also claim discretionary immunity. Nevada looks to federal decisional law on the Federal Tort Claims Act for guidance on what type of conduct discretionary immunity protects. *Martinez*, 168 P.3d at 727-28. Many federal circuit courts have held that "decisions relating to the hiring, training, and supervision of employees usually involve policy

---

[7] Because Estes was not at the scene and played no part in removing the Bruins from the Impala or handcuffing them, nor is there any allegation that she created or promulgated unconstitutional policies leading to the violation, this portion of the state law claims does not apply to her.

judgments of the type Congress intended the discretionary function exception to shield." *Vickers v. United States*, 228 F.3d 944, 950 (9th Cir. 2000) (citing cases).  However, here the Bruins allege that Arias and Osborn created or perpetuated unconstitutional policies, as opposed to alleging they failed to properly train or supervise.  Arias and Osborn therefore are not entitled to discretionary immunity on the state law claims because they have no discretion to create unconstitutional policies. *Nurse*, 226 F.3d at 1002 (stating that where the complaint alleges that policy-making defendants promulgated an unconstitutional policy, discretionary immunity under the FTCA does not apply).

### 2.  Negligent Infliction of Emotional Distress

Finally, the defendants argue the Bruins' negligent infliction of emotional distress claims should be dismissed because Robin and Beverly seek to recover emotional distress as direct victims of the defendants' alleged negligence, rather than as bystanders.  However, each of them was a bystander to the other's removal from the car at gunpoint and the subsequent detention at the roadside. *Grotts v. Zahner*, 989 P.2d 415, 416 (Nev. 1999) (stating that to establish a negligent infliction of emotional distress claim, the plaintiff must show that "he or she (1) was located near the scene; (2) was emotionally injured by the contemporaneous sensory observance of the [incident]; and (3) was closely related to the victim").  Thus, each may seek to recover damages as a bystander.  Additionally, to the extent they seek emotional distress damages for their own detention, they may do so as part of their negligence claim. *Shoen v. Amerco, Inc.*, 896 P.2d 469, 477 (Nev. 1995).

## III.  CONCLUSION

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment (**Dkt. #22) is GRANTED in part and DENIED in part**.  The defendants are granted summary judgment on:

- counts one and two to the extent those claims are based on a lack of probable cause;
- count three;
- count four; and

• counts seven through eleven to the extent those claims are based on (a) the decision to detain and arrest and (b) the decision of what information to convey from dispatch.

The motion is denied in all other respects. Thus, the claims remaining for trial are:

• counts one and two and seven through eleven against defendants Herrera, Slattery, Poehl, Arias, and Osborn to the extent those claims are based on the manner of the Bruins' detention.

DATED this 19th day of February, 2016.

_____
ANDREW P. GORDON
UNITED STATES DISTRICT JUDGE